Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VI

| MARTA GUEVARA NÚÑEZ<br><br>Apelante<br><br>v.<br><br>BELLA INTERNATIONAL, LLC Y OTROS<br><br>Apelados | KLAN202400950 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso número: BY2022CV04994<br><br>Sobre: Reclamación de Despido Injustificado; Ley 80 (Despido Constructivo); Procedimiento Sumario, Ley 2 |

Panel integrado por su presidenta, la jueza Ortiz Flores, la juez Aldebol Mora y la jueza Boria Vizcarrondo.

# SENTENCIA

En San Juan, Puerto Rico, a 8 de agosto de 2025.

Comparece la parte apelante, Marta Guevara Núñez, y nos solicita que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón, el 10 de octubre de 2024, notificada al día siguiente. Mediante dicho dictamen, el foro primario declaró No Ha Lugar la querella radicada por la apelante y ordenó la desestimación con perjuicio de la acción.

Por los fundamentos que exponemos a continuación, se revoca el dictamen apelado. Veamos.

## I

El 29 de septiembre de 2022, Marta Guevara Núñez (Guevara Núñez o apelante) incoó una *Querella* sobre despido injustificado en contra de Bella International, LLC, Bella Auto Group, LLC, Bella Retail Group, LLC, Bella Group, LLC y Bella Group del Norte, LLC (Bella, apelada o apelados).[1] La referida causa de acción fue instada

---

[1] Apéndice del recurso, págs. 1-5.

Número Identificador

SEN2025 _____

al amparo del procedimiento sumario de la *Ley de Procedimiento Sumario de Reclamaciones Laborales*, Ley Núm. 2 de 17 de octubre de 1961, según enmendada, 32 LPRA sec. 3118 *et seq.* (Ley Núm. 2-1961). En particular, Guevara Núñez indicó que trabajó ininterrumpidamente para Bella durante diecinueve (19) años. Detalló que había comenzado sus labores con dicha entidad en el área de recepción y, posteriormente, debido a su desempeño, fue gerente de servicios. Alegó que, sin razón atribuible a esta, el 6 de septiembre de 2021, el vicepresidente de Bella y la directora de recursos humanos, la destituyeron de su puesto de gerente de servicios y le ofrecieron un puesto como asesora de servicios, el cual era de menor jerarquía y salario. Según adujo, le indicaron que la razón del cambio de puesto fue porque no cumplió con los requisitos operacionales de la empresa.

No obstante, Guevara Núñez arguyó en la acción de epígrafe que el verdadero motivo de su destitución fue que la producción de Bella se vio afectada tanto por la pandemia del COVID-19 como por la falta de personal técnico, asesores y piezas. Argumentó que, a pesar de que los números de todos los centros de servicios de Bella se afectaron, fue la única gerente de servicios destituida, pues los gerentes varones que incumplían con las metas de producción de la empresa fueron transferidos. Planteó que, debido a lo anterior, presentó su renuncia el 13 de octubre de 2021. En virtud del referido despido constructivo o tácito, solicitó el pago de la mesada equivalente a $128,641.07, más $32,160.27 en concepto de horarios de abogado(a), para un total de $160,801.34.

Por su parte, el 14 de octubre de 2022, Bella presentó su alegación responsiva.[2] En esencia, negó las alegaciones en su contra y planteó que Guevara Núñez no fue destituida. Arguyó que, antes

---

[2] Íd., págs. 6-10.

de su renuncia voluntaria, Guevara Núñez estaba desempeñándose por debajo de las expectativas de la empresa y, consciente de ello, solicitó un cambio de posición. Planteó que, a pesar del pobre desempeño de Guevara Núñez como gerente de servicios, le ofreció un traslado a la posición de asesora de servicios. Según adujo, varios días después de la mencionada oferta, Guevara Núñez presentó una carta de renuncia. Argumentó que desconocía las razones para la renuncia de Guevara Núñez, pero planteó que ello no obedeció a actuación alguna de su parte dirigidas a inducirla o forzar su renuncia. Sostuvo que había actuado de forma justificada en todo momento y conforme a la ley, reglamentos y políticas internas, así como al buen y normal funcionamiento del negocio.

Culminado el descubrimiento de prueba luego de ser extendido, denegado un petitorio sumario, atendidas múltiples mociones (entre ellas réplicas y dúplicas sobre asuntos irrelevantes), celebrado el juicio en su fondo y evaluadas las posturas de las partes, el 10 de octubre de 2024, notificada al día siguiente, el Tribunal de Primera Instancia emitió la *Sentencia* que nos ocupa.[3] En particular, el foro primario desglosó las siguientes determinaciones de hechos:

a. **Resolución del 2 de octubre de 2023, [A]tendiendo la Solicitud de Sentencia Sumaria:**

1. La señora Guevara comenzó a trabajar para BI el 2 septiembre de 2002.
2. El 1 de marzo de 2015, la señora Guevara se desempeñaba como "gerente de servicios", con un salario base de $1,730.77 bisemanales, lo que incluía un plan de bonificaciones mensual y beneficios[,] como un vehículo de motor, pago de gasolina, mantenimiento y seguro.
3. La querellante ocupó la posición de gerente de servicio hasta el 6 de septiembre de 2021.
4. BI es una empresa que se dedica a la distribución de automóviles.
5. A lo largo de su trabajo con BI[,] la señora Guevara ocupó varios puestos: un (1) año como recepcionista, once (11) años como asesora de servicios, siete (7) meses como asistente de gerente, y siete (7) años como gerente de servicios en Bella Auto Mall, en Bayamón, que son cuatro (4) concesionarios de distintas marcas de autos.

---

[3] Apéndice del recurso, págs. 1023-1038.

6. El salario más alto devengado por la señora Guevara en los últimos tres años antes de su destitución fue de $80,594.41.

7. Como gerente de servicio, la señora Guevara era responsable de cumplir con las expectativas de satisfacción de los clientes y con ciertas métricas conocidas como "Key Performance Indicators" ("KPI"). Los "KPI" constituyen las metas establecidas por la empresa que los gerentes de servicio están obligados a cumplir. Entre las metas que los gerentes de servicios tenían que cumplir se encontraban las horas de servicio, satisfacción de clientes y cumplir órdenes de reparaciones.

8. Había metas diarias, semanales y mensuales, sobre las cuales se generaban reportes en un momento diariamente y se le enviaban al presidente de la compañía.

9. La querellante le daba mucha importancia a las metas y a los indicadores que le daba BI.

10. La señora Guevara fue citada a una reunión el 6 de septiembre de 2021, en la que participó el señor Medina y la señora Pacheco, donde se le informó que fue removida de su puesto de gerente de servicios. En dicha reunión, se le dio a la querellante la opción de continuar con la empresa como "asesora de servicios" en cualquier centro, con excepción de Bayamón.

11. Al concluir la reunión del 6 de septiembre de 2021, a la querellante se le dijo que se fuera y lo pensara sobre ocupar el puesto que se le ofrecía.

12. La señora Guevara presentó su carta de renuncia el 13 de octubre de 2021.

## b. Hechos Estipulados por las [P]artes:

13. La estructura gerencial del Departamento de Servicio dentro del cual se desempeñaba la [q]uerellante era la siguiente: un [v]icepresidente de [p]iezas y [s]ervicios, que para el periodo relevante de la Querella era el Sr. José Medina. A [e]ste le sigue un [d]irector, que supervisa un área asignada y luego sigue él o la [g]erente de [s]ervicio a cargo de dicho departamento en cada concesionario.

14. Al momento en que Marta fue removida de su puesto el 6 de septiembre de 2021, su salario base como "[g]erente de [s]ervicio" era de $50,000.00 anuales.

15. La compensación como "[g]erente de [s]ervicio", incluía el sueldo base y un incentivo por los resultados obtenidos.

16. El puesto de "[a]sesor de [s]ervicio" tiene un salario base más bajo que el de "[g]erente de [s]ervicio".

17. La mesada que le correspondería a la [q]uerellante, de proceder su reclamación, es de $128,609.93.

18. La [q]uerellada decidió renunciar porque la movieron de la posición de [g]erente de [s]ervicio y que si no la hubiesen movido de [g]erente de [s]ervicio no hubiera renunciado.

## c. Hechos Probados [D]urante el Juicio

19. Bella establece unas metas para los gerentes de servicio y estos vienen obligados a cumplirlas.

20. El Sr. José Medina era la persona de mayor jerarquía en el Departamento de Piezas y Servicio.

21. El cumplimiento con las metas es esencial para lograr la rentabilidad de la empresa. En la medida en que no se cumplan con las metas, se pone en riesgo la existencia del negocio.

22. La rentabilidad del centro de servicio es una porción significativa de los ingresos de la empresa. Los ingresos se basan en la venta de automóviles y servicio.

23. En el área de servicio se brinda mantenimiento y mecánica. Si no entran vehículos al área de servicio[,] no se generan ingresos en ese departamento.

24. El Sr. Medina establecía las metas en conjunto con el Departamento de Finanzas y él las analizaba para hacerlas por cada centro individual.

25. Las metas se establecían considerando los resultados históricos de la localidad y la situación actual de la localidad, incluyendo el personal disponible.

26. A la [q]uerellante se le entregaban unos informes de productividad y evaluación de su desempeño como gerente de servicio, en el que se medían: las horas de servicio, las ventas de gomas, ventas de productos "Air Life", Horas x RO CP, % "Customer Pay", "Effective Labor Rate CP" y envío de vídeos "TruVideo".

27. En las evaluaciones de desempeño como gerente de servicio, se discutía con la querellante línea por línea de la misma, se le hacían observaciones puntuales y deficiencias.

28. De los renglones antes mencionados, el más importante era el de las horas de servicio.

29. Para el mes de septiembre del 2020, la [q]uerellante obtuvo una puntuación de 43% en su informe de producción mensual correspondiente al taller de servicio Honda de Bayamón.

30. La [q]uerellante, para el mes de septiembre del 2020, obtuvo una puntuación de 57% en su informe de producción mensual correspondiente al taller de servicio Mazda de Bayamón.

31. La [q]uerellante, para el mes de septiembre del 2020, obtuvo una puntuación de 43% en su informe de producción mensual correspondiente al taller de servicio Flagship Volkswagen.

32. La [q]uerellante, para el mes de octubre del 2020, obtuvo una puntuación de 57% en su informe de producción mensual correspondiente al taller de servicio Honda de Bayamón.

33. La [q]uerellante, para el mes de octubre del 2020, obtuvo una puntuación de 29% en su informe de producción mensual correspondiente al taller de servicio Mazda de Bayamón.

34. La [q]uerellante, para el mes de octubre del 2020, obtuvo una puntuación de 43% en su informe de producción mensual correspondiente al taller de servicio Flagship Volkswagen.

35. La [q]uerellante, para el mes de noviembre del 2020, obtuvo una puntuación de 43% en su informe de producción mensual correspondiente al taller de servicio Honda de Bayamón.

36. La [q]uerellante, para el mes de noviembre del 2020, obtuvo una puntuación de 29% en su informe de producción mensual correspondiente al taller de servicio Flagship Volkswagen.

37. La [q]uerellante, para el mes de noviembre del 2020, obtuvo una puntuación de 14% en su informe de producción mensual correspondiente al taller de servicio Mazda de Bayamón.

38. La [q]uerellante, para el mes de diciembre del 2020, obtuvo una puntuación de 71% en su informe de producción mensual correspondiente al taller de servicio Honda de Bayamón.

39. La [q]uerellante, para el mes de diciembre del 2020, obtuvo una puntuación de 43% en su informe de

producción mensual correspondiente al taller de servicio Flagship Volkswagen.

40. La [q]uerellante, para el mes de diciembre del 2020, obtuvo una puntuación de 50% en su informe de producción mensual correspondiente al taller de servicio Mazda de Bayamón.

41. La [q]uerellante, para el mes de enero del 2021, obtuvo una puntuación de 57% en su informe de producción mensual correspondiente al taller de servicio Honda de Bayamón.

42. La [q]uerellante, para el mes de enero del 2021, obtuvo una puntuación de 57% en su informe de producción mensual correspondiente al taller de servicio Flagship Volkswagen.

43. La [q]uerellante, para el mes de enero del 2021[,] obtuvo una puntuación de 43% en su informe de producción mensual correspondiente al taller de servicio Mazda de Bayamón.

44. La [q]uerellante, para el mes de febrero del 2021, obtuvo una puntuación de 57% en su informe de producción mensual correspondiente al taller de servicio Honda de Bayamón.

45. La [q]uerellante, para el mes de febrero del 2021, obtuvo una puntuación de 57% en su informe de producción mensual correspondiente al taller de servicio Flagship Volkswagen.

46. La [q]uerellante, para el mes de marzo del 2021, obtuvo una puntuación de 71% en su informe de producción mensual correspondiente al taller de servicio Honda de Bayamón.

47. La [q]uerellante, para el mes de marzo del 2021, obtuvo una puntuación de 29% en su informe de producción mensual correspondiente al taller de servicio Honda de *[sic]* Flagship Volkswagen.

48. La [q]uerellante, para el mes de abril del 2021, obtuvo una puntuación de 57% en su informe de producción mensual correspondiente al taller de servicio Honda de Bayamón.

49. La [q]uerellante, para el mes de abril del 2021, obtuvo una puntuación de 50% en su informe de producción mensual correspondiente al taller de servicio Flagship Volkswagen.

50. La [q]uerellante, para el mes de mayo del 2021, obtuvo una puntuación de 50% en su informe de producción mensual correspondiente al taller de servicio de Honda de Bayamón.

51. La [q]uerellante, para el mes de mayo del 2021, obtuvo una puntuación de 14% en su informe de producción mensual correspondiente al taller de servicio Flagship Volkswagen.

52. La [q]uerellante, para el mes de junio del 2021, obtuvo una puntuación de 29% en su informe de producción mensual correspondiente al taller de servicio Honda de Bayamón.

53. La [q]uerellante, para el mes de junio del 2021, obtuvo una puntuación de 29% en su informe de producción mensual correspondiente al taller de servicio Honda de *[sic]* Flagship Volkswagen.

54. La [q]uerellante, para el mes de junio del 2021, obtuvo una puntuación de 14% en su informe de producción mensual correspondiente al taller de servicio Mazda de Bayamón.

55. La [q]uerellante, para el mes de julio del 2021, obtuvo una puntuación de 50% en su informe de producción mensual correspondiente al taller de servicio Honda de Bayamón.

56. La [q]uerellante, para el mes de julio del 2021, obtuvo una puntuación de 29% en su informe de producción mensual correspondiente al taller de servicio Honda de *[sic]* Flagship Volkswagen.

57. La [q]uerellante, para el mes de julio del 2021, obtuvo una puntuación de 43% en su informe de producción mensual correspondiente al taller de servicio Mazda de Bayamón.

58. La [q]uerellante no cumplió con sus metas en los meses de enero, febrero, marzo, abril, mayo, junio y julio de 2021.

59. En el mes de julio de 2019, la [q]uerellante como [g]erente de [s]ervicio recibió instrucciones de utilizar la herramienta de ventas TruVideo y se le aclaró que negarse a utilizarla no era posible ni saludable.

60. En los meses de septiembre y octubre de 2020, el cumplimiento con el envío de TruVideo en las localidades de Honda de Bayamón y Mazda de Bayamón fue cero, mientras que en la localidad de Flagship Volkswagen fue de 3% y 10%[,] respectivamente.

61. En los meses de diciembre de 2020, enero y febrero de 2021, las localidades supervisadas por la [q]uerellante lograron un 100% de envío de TruVideo.

62. En los meses de marzo, abril, mayo, junio y julio, las localidades supervisadas por la [q]uerellante no cumplieron con el envío de TruVideo, excepto Honda de Bayamón y únicamente en el mes de abril.

63. El 22 de abril de 2021, la [q]uerellante se reunió con la Sra. Daisy Rodríguez. Al discutirse que no estaba cumpliendo con las metas, la [q]uerellante expresó que necesitaba un cambio y que no se vislumbraba como [g]erente de [s]ervicio en ningún otro centro de servicio. Solicitó, además, que[,] de surgir la oportunidad[,] le gustaría encargarse de dar adiestramiento de servicio o trabajar en mercadeo.

64. Lo dialogado entre la [q]uerellada y la Sra. Rodríguez fue recogido en un correo electrónico del 22 de abril de 2021 preparado por la Sra. Rodríguez y enviado al señor José Medina, quien era el supervisor directo de la [q]uerellante, con copia a la Sra. Elisa Pacheco, quien era la [d]irectora de [d]esarrollo [o]rganizacional.

65. Posterior a la reunión del 22 de abril de 2021, la Sra. Rodríguez visitaba frecuentemente el área de trabajo de la [q]uerellante y hablaba con ella para asistirla y ver cómo estaba. En esas visitas[,] la Sra. Rodríguez notaba a la [q]uerellante abrumada y de brazos caídos. La petición de cambio de la [q]uerellante seguía siendo la misma.

66. Para el 22 de abril de 2021, no había vacante en las áreas de adiestramiento y mercadeo.

67. La oficina del Sr. Medina era puerta con puerta con la de la [q]uerellante, por lo que la veía e interactuaba con ella frecuentemente. Con posterioridad a la reunión del 22 de abril de 2021, él notaba que su desempeño estaba lejos de lo que requiere la empresa a nivel de producción y que su operación no estaba en cumplimiento con las expectativas de la empresa.

68. En varias ocasiones[,] el Sr. Medina se reunió con la [q]uerellante para ver de qué manera la podía ayudar y hablaron de las oportunidades para llegar a la rentabilidad de la operación de la empresa.

69. El 6 de septiembre de 2021, la Sra. Pacheco y el Sr. Medina se reunieron con la [q]uerellante y le informaron que, como ella misma había solicitado un cambio y debido a que no estaba cumpliendo con las metas de la empresa, la estaban removiendo de su posición como

[g]erente de [s]ervicio y se le ofreció ocupar una posición como [a]sesora de [s]ervicio.

70. Cuando se le informó que estaba siendo removida de la posición de [g]erente de [s]ervicio y se le ofreció la posición de [a]sesora de [s]ervicio, la [q]uerellante preguntó si podía continuar como [g]erente de [s]ervicio, pero en otra localidad. También preguntó sobre la posición de adiestramiento de servicio. En ese entonces se le informó que no había vacante en esas posiciones, y también, que como no había cumplido con las metas como gerente de servicio, ocupar tal posición en otra localidad no era una alternativa.

71. Antes de concluir la reunión del 6 de septiembre de 2021, se le dijo a la [q]uerellante que tomara el resto del día libre para pensar en lo que se le estaba ofreciendo, para que pudiera dar una respuesta.

72. La [q]uerellante no trabajó, no dio una respuesta, así como tampoco propuso alguna otra alternativa, sino que[,] el 13 de octubre de 2021, más de un mes después de la reunión, presentó su carta de renuncia.

73. En su carta de renuncia[,] la [q]uerellante expresó todas las razones para renunciar y[,] en ningún momento[,] mencionó [una] razón relacionada a justificar el porqué *[sic]* ella no cumplía con las metas de servicio.

74. Entre las labores de la [q]uerellante se encontraba "lograr la retención de su equipo de trabajo"; "atender a los clientes personalmente"; "[c]onocer y asegurar que el personal utilice eficientemente las herramientas implementadas por la empresa" incluyendo, "TruVideo".

75. Para el 6 de septiembre de 2021, la posición de adiestramiento estaba ocupada por otra empleada, por lo que no estaba disponible.

76. Para el 6 de septiembre de 2021, no había vacante de [g]erente de [s]ervicio en alguna otra localidad.

77. La compensación de un [a]sesor de [s]ervicio se basa en un salario base, más comisiones y beneficios.

78. Hay [a]sesores de [s]ervicio que, incluyendo comisiones, reciben una compensación mayor que la de un [g]erente de [s]ervicio.

79. Para ofrecerle a la [q]uerellante la posición de [a]sesora de [s]ervicio, se hizo un análisis de qué posición disponible comparaba con la compensación de la [q]uerellante.

80. La posición de la querellada era retener a la querellante como empleada, pero no como gerente de servicio. Entendían [que] podía ejecutar mejor la posición de asesora de servicio, como ya había hecho antes.

81. En reuniones diarias de gerentes de servicio, se les advertía que, de no cumplir con sus metas, se les podía transferir o despedir. La [q]uerellante específicamente fue advertida que de no cumplir podía ser transferida o separada de su empleo.

82. La [q]uerellante, como [g]erente de [s]ervicio, era la responsable de establecer los objetivos y compromisos diarios a realizar.

83. A solicitud de la [q]uerellante[,] la empresa añadió un [g]erente de [s]ervicio quien la apoyaría en sus funciones.

84. Bella también asignó a Alexandra Rosario y a Chrisnette, para ayudarla en sus funciones. (Citas omitidas).[4]

El foro primario concluyó que no se configuró un despido

constructivo, por lo que se incumplió con el requisito de despido

---

[4] Apéndice del recurso, págs. 1026-1032.

requerido por nuestro ordenamiento jurídico. Resolvió que, si bien era cierto que Guevara Núñez había sido removida de su puesto como gerente de servicios, la prueba desfilada en el juicio demostró que dicha remoción estuvo motivada por el interés genuino de Bella de salvaguardar el efectivo desempeño de la empresa. En vista de ello, declaró No Ha Lugar la acción de epígrafe y la desestimó con perjuicio.

Inconforme, el 21 de octubre de 2024, la parte apelante acudió ante esta Curia mediante el recurso de epígrafe y señaló los siguientes errores:

> La Sentencia del Tribunal de Primera Instancia se basó en un trámite de aproximadamente tres años que menoscabó la naturaleza de un procedimiento bajo la Ley [Núm.] 2, así como el derecho de la querellante al debido proceso de ley y al descubrimiento de prueba.
>
> El Tribunal de Primera Instancia concluyó erróneamente que la querellante no demostró un despido constructivo, a pesar de que un análisis objetivo de las determinaciones previas y las estipulaciones entre las partes demostraban que no estaba en controversia que la querellante presentó su renuncia como consecuencia de haber sido destituida de su puesto gerencial y degradada a uno de menor jerarquía y salario.
>
> El Tribunal de Primera Instancia actuó con prejuicio en la valoración de la prueba al: (1) descartar injustificadamente el testimonio de la querellante sobre las circunstancias de su renuncia; (b) aceptar sin reservas el testimonio de los testigos de la querellada, incluso en materias objetadas; y (c) coartar el derecho de la querellante a impugnar a los testigos contrarios.
>
> El Tribunal [de Primera Instancia] concluyó que las metas impuestas a la querellante no eran arbitrarias ni caprichosas, aunque la querellada no presentó bases empíricas para establecerlas ni llamó como testigo al ejecutivo responsable de su formulación.
>
> En su proceder para concluir que las metas impuestas a la querellante no eran arbitrarias ni caprichosas y que su destitución obedeció a un interés legítimo del patrono, el Tribunal de Primera Instancia: (a) impidió a la querellante usar como prueba de impugnación las evaluaciones de otros gerentes varones, y (b) se negó a tomar conocimiento judicial del expediente del caso SJ2022CV00328, todo lo anterior a pesar de ser hechos adjudicativos y pertinentes a la reclamación de la querellante.

Posteriormente, presentada la transcripción de la prueba oral estipulada y luego de concedidas varias prórrogas a esos efectos, el 2 de mayo de 2025, la parte apelante presentó un *Alegato Suplementario de la Apelante*. Por su lado, la parte apelada compareció mediante *Oposición a "Alegato Suplementario de la Apelante"* el 11 de junio de 2025.

Con el beneficio de la comparecencia de las partes, así como con la transcripción de la prueba oral, procedemos a resolver.

**II**

**A**

Sabido es que la *Ley de Procedimiento Sumario de Reclamaciones Laborales*, Ley Núm. 2 de 17 de octubre de 1961, según enmendada, 32 LPRA sec. 3118 *et seq.* (Ley Núm. 2-1961), establece un procedimiento de naturaleza sumario para aquellos casos que versen sobre reclamaciones de una persona obrera o empleada en contra de su patrono, referentes a cualquier derecho o beneficio, o cualquier suma por concepto de compensación por trabajo o labor realizados, o en ocasión a un despido de su empleo sin justa causa, todo en aras de abreviar los trámites pertinentes a las mismas, de manera que resulte en un proceso menos oneroso para la persona trabajadora. 32 LPRA sec. 3118; *Peña Lacern v. Martínez Hernández et al.*, 210 DPR 425 (2022); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 164 (2021); *León Torres v. Rivera Lebrón*, 204 DPR 20 (2020); *Ruiz Camilo v. Trafon Group*, Inc., 200 DPR 254 (2018). Su alcance se extiende a varios estatutos laborales, entre estos, las querellas sobre salarios, beneficios y derechos laborales. *Ruiz Camilo v. Trafon Group, Inc.*, supra, pág. 265. La naturaleza de esta reclamación exige celeridad en su trámite para, así, cumplir con el fin legislativo de proteger el empleo, desalentar los despidos injustificados y proveer a la persona obrera despedida suficientes recursos económicos entre un empleo y otro. *León Torres v. Rivera*

*Lebrón*, supra. A su vez, el Tribunal Supremo de Puerto Rico ha enfatizado que las disposiciones de la pieza legislativa antes mencionada se deberán interpretar de manera liberal a favor de la persona empleada. Ello, para equiparar la desigualdad de los medios económicos que exista entre las partes. *Vizcarrondo Morales v. MVM, Inc.*, 174 DPR 921, 928-929 (2008).

Cónsono con lo anterior, la Sección 3 de la Ley Núm. 2-1961, 32 LPRA sec. 3120, establece, en lo pertinente, que en los casos tramitados con arreglo a dicho estatuto "se aplicarán las Reglas de Procedimiento Civil en todo aquello que no esté en conflicto con las disposiciones específicas de las mismas o con el carácter sumario del procedimiento establecido por esta ley". *Díaz Santiago v. PUCPR et al.*, 207 DPR 339, 348 (2021). Es decir, se recurrirá a las Reglas de Procedimiento Civil, 32 LPRA Ap. V, cuando estas no contravengan lo dispuesto en la Ley Núm. 2-1961, *supra,* o prolonguen innecesariamente el carácter sumario del procedimiento. *Íd.*

**B**

Por otra parte, el Tribunal Supremo de Puerto Rico ha expresado que la determinación de tramitar un caso instado al amparo de la Ley Núm. 2-1961, *supra,* por la vía ordinaria, va a depender de la complejidad del caso y de las demás reclamaciones instadas en este. Sobre este asunto, nuestro más Alto Foro ha reconocido la discreción que tienen los tribunales de instancia para determinar si una querella presentada por una persona obrera debía ser tramitada por la vía ordinaria, aun cuando la persona obrera reclamante considerara conveniente tramitarla de forma sumaria. *Rivera v. Insular Wire Products Corp.*, 140 DPR 912, 936 (1996). Ello debe estar basado en un ponderado análisis de los intereses involucrados. En dicho ejercicio, los tribunales deben hacer "un justo balance entre los intereses del patrono y los d[e] [la persona]

obrer[a] querellante —a la luz de las circunstancias específicas de las reclamaciones en la querella— [...]". *Íd.*, pág. 927. En ese sentido, el Foro de última instancia ha expresado que los tribunales deben considerar los siguientes factores para determinar si procede la conversión del proceso sumario en uno ordinario: (1) si los hechos descritos requieren tomar deposiciones a múltiples testigos; (2) si a la luz de las alegaciones se requerirá la presentación de prueba pericial particularmente compleja; y, (3) si resulta necesario el examen de expedientes médicos o la realización de exámenes físicos que convertirán el descubrimiento de prueba en una etapa incompatible con el carácter expedito del procedimiento dispuesto en la Ley Núm. 2-1961, *supra.* Véase, *Berrios v. González et al.,* 151 DPR 327, 347 (2000).

Ahora bien, cuando el tribunal de instancia opte por tramitar la causa por vía ordinaria, deberá simultáneamente tomar las medidas correspondientes para que la acción o acciones incoadas se incluyan en un calendario especial para que sean atendidas con carácter prioritario. *Íd.* De esta manera, se evita que la conversión del proceso perjudique el interés de la persona obrera de que se haga una adjudicación rápida de su reclamación. *Íd.* En ese sentido, dicha determinación no debe efectuarse livianamente. Es decir, una mera alegación de la parte querellada en términos de que la reclamación instada en su contra es compleja, no justifica la conversión del proceso en uno ordinario. Véase, *Vizcarrondo Morales v. MVM, Inc.*, 174 DPR 921, 932 (2008).

## C

Por otro lado, la *Ley Sobre Despidos Injustificados*, Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 LPRA sec. 185a *et seq.* (Ley Núm. 80-1976), tiene el propósito de proteger a la persona empleada de actuaciones arbitrarias del patrono e imponer remedios económicos que desalienten la práctica de despedir a las

personas empleadas injustificadamente. *Ruiz Mattei v. Commercial Equipment Finance, Inc.*, 2024 TSPR 68, resuelto el 21 de junio de 2024; *González Méndez v. Acción Social et al.*, 196 DPR 213, 229 (2016); *SLG Torres-Matundan v. Centro Patología,* 193 DPR 920, 929 (2015). Dicha política pública se sustenta en que el trabajo tiene una función social trascendental, tanto en el ámbito individual como en el colectivo. A esta realidad responde la afirmación de que el trabajo tiene un profundo significado ético, porque mediante este la persona aporta al bien común y se autorrealiza.

Las protecciones conferidas por la Ley Núm. 80-1976, *supra,* se extienden a toda persona empleada que: (1) trabaja para un patrono mediante remuneración; (2) haya sido contratada sin tiempo determinado, y (3) sea despedida sin que mediara una justa causa. 29 LPRA sec. 185a. Presentes estas circunstancias, la persona empleada, así despedida, tiene derecho a recibir de su patrono el pago de una indemnización, típicamente denominada como la *mesada,* cuya cuantía dependerá de la duración del empleo y del sueldo que devengaba. *Íd.*; *Lugo Montalvo v. Sol Meliá Vacation,* 194 DPR 209, 230 (2015); *Whittenburg v. Col. Ntra. Sra. Del Carmen,* 182 DPR 937, 950 (2011). Por tal razón, es importante destacar que "el estándar de justa causa es el requisito requerido en la mayoría de los países del mundo para convalidar las acciones de los empleadores. Si el patrono despide injustificadamente a un trabajador estaría entonces sujeto a la sanción económica que impone el estatuto protector". C. Zeno Santiago, *El Despido y la Política Social en Nuestro Estado de Derecho*, 34 Rev. Jur. UIPR 213, 217 (2000).

Ahora bien, nuestro ordenamiento jurídico no prohíbe absolutamente el despido de una persona empleada; más bien, castiga el despido sin justa causa. *Segarra Rivera v. Int'l. Shipping et al.*, 208 DPR 964, 982 (2022); *Rivera Figueroa v. The Fuller Brush*

*Co.*, 180 DPR 894, 904 (2011). En ese sentido, la Ley Núm. 80-1976, *supra,* considera injustificado el despido que se hace por mero capricho del patrono, y no guarda relación con la necesidad de asegurar el buen y normal funcionamiento de un establecimiento. 29 LPRA sec. 185b; *León Torres v. Rivera Lebrón,* 204 DPR 20, 38 (2020).

Cónsono con lo anterior, el Artículo 2 de la Ley Núm. 80-1976, 29 LPRA sec. 185b, instituye posibles situaciones en las cuales existe justa causa para el despido. En particular, desglosa las siguientes circunstancias:

(a) Que el obrero siga un patrón de conducta impropia o desordenada.

(b)  La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento

(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidas para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.

(d) Cierre total, temporero o parcial de las operaciones del establecimiento. [...]

(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.

(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido.

[…]

Según lo precitado, la Ley Núm. 80-1976, *supra,* no establece específicamente qué constituye un despido injustificado, pero desglosa varios escenarios o circunstancias que liberan al patrono de responsabilidad. *Segarra Rivera v. Int'l. Shipping et al.,* supra,

pág. 983; *Indulac v. Unión*, 207 DPR 279, 298 (2021). Algunas de estas circunstancias están basadas en conducta atribuible a la persona empleada, mientras que otras responden al curso decisorio de la gerencia empresarial. *Íd.* En ese sentido, las circunstancias constitutivas de justa causa, según previamente esbozados, constituyen meros ejemplos de situaciones asociadas a un despido. *Indulac v. Unión*, supra, pág. 299. Por lo tanto, el precitado estatuto no prevé el universo de incidencias que puedan surgir en un entorno laboral y que desemboquen en la cesantía de una persona empleada. *Íd.*

Es decir, el citado Artículo 2 de la Ley Núm. 80-1976, *supra,* no dispone una lista taxativa de las circunstancias que pueden dar lugar a un despido por justa causa. *Indulac v. Unión*, supra, pág. 299. Ello obedece a que el mencionado estatuto no favorece el despido como sanción a la primera falta cometida por una persona empleada. *Íd.*, págs. 299-300, citando a *Srio. del Trabajo v. I.T.T.,* 108 DPR 536, 542-543 (1979). Sin embargo, la referida norma no es una absoluta. *Íd.*, pág. 300. El Tribunal Supremo de Puerto Rico ha resuelto que existen circunstancias en las que una sola ofensa o primera falta pudieran justificar un despido. *Íd.* Así, pues, este curso de acción podría considerarse justificado si dicha acción u omisión, por su gravedad y potencial de agravio, pone en riesgo la seguridad, el orden y la eficiencia que constituye el funcionamiento de la empresa. *Íd.*

Cónsono con lo anterior, al amparo de la Ley Núm. 80-1976, *supra,* se ha reconocido que una sola ofensa puede constituir justa causa para el despido. *Indulac v. Unión*, supra. Ahora bien, dicha falta debe ser de tal seriedad o naturaleza que revele una actitud o un detalle del carácter de la persona empleada, tan lesivo a la paz y al buen orden de la empresa, que constituiría imprudencia esperar su reiteración para separarla del establecimiento. *Íd.*; *Rivera v. Pan*

*Pepín*, 161 DPR 681, 690 (2004); *Delgado Zayas v. Hosp. Int. Med. Avanzada*, 137 DPR 643 (1994); *Aut. Edif. Púb. v. Unión Indep. Emp. A.E.P.*, 130 DPR 983, 994 (1992). De modo que lo esencial es que, del agravio perpetrado por la persona empleada ponga de manifiesto una condición, que dentro del contexto del empleo sea inaceptable o intolerable, independientemente de que se trate de una primera falta. *Íd.*, págs. 300-301; *Torres Solano v. P.R.T.C.*, 127 DPR 499, 516 (1990).

Por otro lado, atinente a la controversia ante nos, el Artículo 5 del citado estatuto, 29 LPRA sec. 185e, define el *despido constructivo* de la siguiente manera:

> A los efectos de las secs. 185a a 185m de este título se entenderá por despido, además de la cesantía del empleado, su suspensión indefinida o por un término que exceda de tres (3) meses, excepto en el caso de empleados de industria y negocios estacionales o la renuncia del empleo motivada por actuaciones del patrono dirigidas a inducirlo o forzarlo a renunciar[,] tales como imponerle o intentar imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de hecho o de palabra.

Al comentar sobre la definición contenida en el precitado artículo, el profesor Jorge Farinacci Fernós expone que:

> [N]o hay tal cosa como una causa de acción por despido constructivo en Puerto Rico. Lo que sí existe es una causa de acción por despido injustificado bajo la Ley 80, en la que se utiliza una definición particular de despido contenida en el artículo 5. Es decir, ya sea porque hubo una cesantía, una suspensión prolongada o una renuncia forzada, en todos estos casos estamos ante un despido, punto. Una vez se establece la existencia del despido, no hay diferencia en si fue producto de una cesantía o una renuncia forzada. Si bien el origen de esta figura es una causa de acción independiente proveniente del *common law*, la forma en que fue adoptada en Puerto Rico no fue como una causa de acción independiente sino como parte de la causa de acción estatutaria general de despido injustificado. J. Farinacci Fernós, *Interpretación liberal: presunciones probatorias en la legislación protectora del trabajo*, 83 Rev. Jur. UPR 16, 40-41 (2014).

De la definición estatutaria de *despido constructivo* podemos colegir tres (3) elementos importantes, a saber: (1) renuncia

motivada; (2) por actuaciones del patrono, y (3) dirigidas a inducir o forzar a la persona empleada a renunciar. Farinacci Fernós, *op. cit.*, págs. 41-42. Cabe resaltar que, el *despido constructivo* no se trata de cualquier tipo de renuncia, sino de una renuncia motivada por actuaciones del patrono. Para determinar si el efecto de las actuaciones del patrono está dirigido a inducir una renuncia, se ha determinado que se debe demostrar que una persona razonable se sentiría forzada a renunciar, es decir, utilizando un criterio objetivo y no a la visión subjetiva de la persona empleada individual. *Rivera Figueroa v. The Fuller Brush Co.*, supra, pág. 908; *S.L.G. Hernández-Beltrán v. TOLIC*, 151 DPR 754, 777 (2000); *Vélez de Reilova v. R. Palmer Bros., Inc.*, 94 DPR 175, 178 (1967).

Nuestro Tribunal Supremo advirtió que, "dado que el despido constructivo es un despido disfrazado que tiene la apariencia de una renuncia voluntaria, los tribunales de instancia deben ser sumamente cautelosos al momento de determinar si, en efecto, una renuncia fue forzada". *Rivera Figueroa v. The Fuller Brush Co.*, supra, pág. 918. De igual manera, no es relevante si la acción fue dirigida a varias personas empleadas, ya que la manera de probar la intención de forzar la renuncia es demostrando que una persona razonable en la posición de la empleada se sienta forzada a renunciar, lo cual puede ser el producto de condiciones onerosas dirigidas contra ella o contra varias empleadas. *Íd.*, págs. 918-919; Farinacci Fernós, *op. cit.*, pág. 44.

**D**

Sabido es que este Tribunal Apelativo actúa, esencialmente, como foro revisor. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Es por ello que, nuestra encomienda principal es examinar cómo los tribunales inferiores aplican el Derecho a los hechos particulares de cada caso. *Íd.* Cónsono con lo anterior, el desempeño de nuestra función revisora se fundamenta en que el

Tribunal de Primera Instancia desarrolle un expediente completo que incluya los hechos que haya determinado ciertos a partir de la prueba que se le presentó. *Íd.* Es decir, nuestra función de aplicar y pautar el Derecho requiere saber cuáles son los hechos, tarea que corresponde, primeramente, al foro de instancia. *Íd.* Como foro apelativo, no celebramos juicios plenarios, no presenciamos el testimonio oral de los testigos, no dirimimos credibilidad y no hacemos determinaciones de hechos. *Íd.* Esa es la función de los tribunales de primera instancia. *Íd.*

Por el contrario, al momento de analizar prueba documental, prueba pericial o testimonios de testigos ofrecidos mediante declaraciones escritas, estamos en la misma posición que el Tribunal de Primera Instancia. *Ortiz et al. v. S.L.G. Meaux*, 156 DPR 488, 495 (2002). Así, "el Tribunal Apelativo tendrá la facultad para adoptar su propio criterio en la apreciación y evaluación de la prueba pericial, y hasta para descartarla, aunque resulte técnicamente correcta". *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021), citando a *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011). Asimismo, es norma básica que las conclusiones de derecho son revisables en su totalidad por el foro apelativo. *Dávila Nieves v. Meléndez Marín*, supra, pág. 770. Ahora bien, como norma general, los tribunales apelativos aceptan como correctas las determinaciones de hechos de los tribunales inferiores, así como su apreciación sobre la credibilidad de los testigos y el valor probatorio de la prueba presentada en la sala. *Íd.*, pág. 771.

En nuestro ordenamiento jurídico no se favorece la intervención de los foros apelativos para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia, en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Sucn.*

*Mena Pamias et al. v. Meléndez et al.*, 212 DPR 758 (2023); *Pueblo v. Hernández Doble*, 210 DPR 850 (2022); *Santiago Ortiz v. Real Legacy et al.*, supra. Ello, debido a que el foro de instancia está en mejor posición que un tribunal apelativo para llevar a cabo esta importante tarea judicial. *Dávila Nieves v. Meléndez Marín*, supra, pág. 771.

En consideración a la norma de corrección que cobija a las determinaciones realizadas por el Tribunal de Primera Instancia, cuando una parte peticionaria señala errores dirigidos a cuestionar la apreciación o suficiencia de la prueba, la naturaleza del derecho apelativo requiere que esta ubique al foro revisor en tiempo y espacio de lo ocurrido en el foro primario. Ello se logra utilizando alguno de los mecanismos de recopilación de prueba oral, como lo son: (1) transcripción de la prueba, (2) exposición estipulada o (3) exposición narrativa. *Pueblo v. Pérez Delgado*, 211 DPR 654 (2023). Los tribunales de mayor jerarquía no pueden cumplir a cabalidad su función revisora sin que se le produzca, mediante alguno de estos mecanismos, la prueba que tuvo ante sí el foro primario. *Íd.*

Sobre ese particular, nuestro Tribunal Supremo ha reiterado que las disposiciones reglamentarias que gobiernan los recursos que se presentan ante el Tribunal de Apelaciones deben observarse rigurosamente. *Pueblo v. Pérez Delgado*, supra. Véase, *Hernández Maldonado v. Taco Maker*, 181 DPR 281 (2011). De esa manera, los abogados y las abogadas tienen la obligación de cumplir fielmente con el trámite prescrito en las leyes y en los reglamentos aplicables para el perfeccionamiento de los recursos. *Íd.* No puede quedar al arbitrio de la representación legal decidir qué disposiciones reglamentarias aplican y cuándo. *Íd.* Por tanto, es tarea de la parte peticionaria presentar al foro revisor la prueba oral bajo la que se pretende impugnar las determinaciones del foro *a quo. Íd.*

Esbozada la norma jurídica, procedemos a aplicarla al recurso antes nos.

**III**

La parte apelante sostiene en su primer error señalado que el Tribunal de Primera Instancia incidió al menoscabar la naturaleza sumaria del proceso bajo la Ley Núm. 2-1961, *supra,* así como su derecho al debido proceso de ley y al descubrimiento de prueba, por basar su determinación en un trámite que se extendió por aproximadamente tres (3) años.

Luego de una revisión sosegada del expediente ante nos, no albergamos duda de que el trámite de la acción de epígrafe se alejó del fin último del procedimiento sumario laboral. Surge de los autos que el foro primario concedió múltiples prórrogas, permitió la presentación de varios escritos, entre ellos réplicas y dúplicas, además de que extendió el descubrimiento de prueba, todo ello solicitado o promovido en su mayoría por la parte apelada, en contravención a la naturaleza sumaria que requiere las acciones presentadas al amparo de la Ley Núm. 2-1961, *supra.*

Si bien nuestro ordenamiento jurídico permite que el foro *a quo* convierta *motu proprio* un procedimiento sumario laboral a uno ordinario, ello requiere un análisis ponderado de: (a) si los hechos descritos requieren tomar deposiciones a múltiples testigos; (2) si a la luz de las alegaciones se requerirá la presentación de prueba pericial particularmente compleja; y, (3) si resulta necesario el examen de expedientes médicos o la realización de exámenes físicos que convertirán el descubrimiento de prueba en una etapa incompatible con el carácter expedito del procedimiento dispuesto en la Ley Núm. 2-1961, *supra.* Nada de lo anterior estuvo presente en la acción de epígrafe. Incluso, en la Conferencia con Antelación al Juicio, el foro juzgador impidió que se presentara un testigo durante el juicio que era vital para resolver la controversia que tenía

ante sí, aun cuando ya se habían atrasado injustificadamente los procedimientos.

Como segundo señalamiento de error, plantea que el foro primario erró al concluir que esta no demostró un despido constructivo, a pesar de que un análisis objetivo de las determinaciones previas y las estipulaciones entre las partes demostraban que no estaba en controversia que había presentado su renuncia como consecuencia de haber sido destituida de su puesto gerencial y degradada a uno de menor jerarquía y salario. En su tercer error señalado, alega que el foro *a quo* incidió al actuar con prejuicio en la valoración de la prueba por: (1) descartar injustificadamente el testimonio de esta sobre las circunstancias de su renuncia; (b) aceptar sin reservas el testimonio de los testigos de la parte apelada, incluso en materias objetadas; y (c) coartar el derecho de esta a impugnar a los testigos contrarios. Como cuarto señalamiento de error, arguye que el foro sentenciador erró al concluir que las metas impuestas no eran arbitrarias ni caprichosas, aunque la parte apelada no presentó bases empíricas para establecerlas ni llamó como testigo al ejecutivo responsable de su formulación. En su quinto y último señalamiento de error, aduce que el foro juzgador incidió al concluir que las metas impuestas no eran arbitrarias ni caprichosas y que la destitución de esta obedeció a un interés legítimo del patrono. Específicó que el foro apelado: (a) impidió que esta usara como prueba de impugnación las evaluaciones de otros gerentes varones; y (b) se negó a tomar conocimiento judicial del expediente del Caso Núm. SJ2022CV00328, a pesar de ser hechos adjudicativos y pertinentes a su reclamación. Por estar relacionados entre sí, discutiremos los referidos señalamientos de error en conjunto.

Según esbozamos, en nuestro ordenamiento jurídico, cuando se cuestiona la apreciación de la prueba realizada por el foro

primario, debemos dar deferencia y solo intervenir cuando se demuestra satisfactoriamente la existencia de pasión, prejuicio, parcialidad o error manifiesto.

En el caso que nos ocupa, resulta imprescindible reproducir y analizar las expresiones esbozadas por el Tribunal de Primera Instancia en la *Sentencia* apelada. En primer lugar, el foro primario indicó que para probar que hubo un despido constructivo, se debía demostrar la existencia de uno o dos actos por parte del patrono, en este caso Bella, que motivaran la renuncia de la persona empleada, es decir, la aquí apelante Guevara Núñez. Dicho foro indicó que no había controversia de que la apelante fue removida de su puesto como gerente de servicios, cumpliéndose así el referido requisito. Luego de evaluar los autos, coincidimos con la mencionada apreciación del foro de origen.

Como segundo requisito, el foro apelado indicó que había que determinar si el acto del patrono estuvo motivado por una razón ajena al genuino interés de proteger el efectivo desempeño de la empresa. En específico, el foro *a quo* expresó lo siguiente:

> En cuanto al segundo requisito, la [q]uerellante no solo no demostró el mismo, sino que la prueba presentada por Bella probó que remover a la [q]uerellante de su posición como [g]erente de [s]ervicio[s], estuvo motivado por un interés genuino de salvaguardar el efectivo desempeño de la empresa.
>
> **La prueba demostró que[,] por varios meses[,] la [q]uerellante no estaba cumpliendo con las metas y continuamente se le advirtió de las posibles consecuencias de no cumplir con dichas metas**. Así quedó evidenciado por las evaluaciones que se hacían del desempeño de la [q]uerellante donde [e]sta incumplía con las mismas.
>
> **A parte de que las evaluaciones hablan por sí mismas, la propia [q]uerellante reconoció que no estaba cumpliendo con las metas. A estos efectos, [e]sta se limitó a declarar que dichas metas eran inalcanzables. Según la [q]uerellante, las metas no eran alcanzables debido la pandemia provocada por el COVID-19, las operaciones que ella dirigía se vieron afectadas por la falta de personal, por el ausentismo provocado por dicha enfermedad, lo que requirió que ella tuviera que hacer trabajos tales**

**como atender a clientes; velar por el complimiento con el protocolo establecido para el COVID-19, el que se adiestraba personal, pero estos se iban y tener que asistir a reuniones diarias.**

**El testimonio de la [q]uerellante en cuanto a las razones antes mencionada fue uno conclusivo y[,] con excepción de algunos ejemplos, de los cuales tampoco pudo ser precisa, no declaró sobre hechos concretos que apoyaran tales conclusiones.**

Respecto a la falta de personal, la [q]uerellante no presentó información alguna, de manera tal que se pueda colegir cómo dicha situación afectó el cumplimiento de ella con las metas de la empresa. Mas allá de declarar que hubo falta de personal para los años 2020 y 2021, la [q]uerellante no precisó en qué momento hubo menos personal del requerido. Por otro lado, surge de la prueba que el movimiento de personal para esos años fue parecido al de años anteriores, aparte de que el número de empleados disponible en la localidad era una de las consideraciones al establecer las metas del mes.

En cuanto a la [q]uerellante tener que a implementar los protocolos de COVID-19, más allá de decir que tenía que realizar ciertos trabajos, no precisó cómo estos afectaron el que pudiera cumplir con las metas. También la prueba fue que, para enero de 2021, el procedimiento en el protocolo cambió y ya no requería la intervención de ella como [g]erente de [s]ervicio[s].

En lo que respecta a tener que estar atendiendo al público, la prueba demostró qu[e] esa es una de sus funciones como [g]erente de [s]ervicio[s] y la [q]uerellante no demostró cómo esa función impedía lograr las metas.

La [q]uerellante declaró de unos tres empleados que se fueron durante la pandemia[.] [N]o obstante, no pudo declarar de qué manera esas ausencias afectaron el que ella cumpliera con las metas establecidas. Lo mismo sucede con el testimonio de la [q]uerellante en torno a empleados que se le adiestraba, pero luego se marchaban. Esta, más allá de identificar un solo caso, no pudo declarar para qué fecha fue que sucedió esa situación, ni establecer cómo ese ejemplo afectó que ella no pudiera cumplir con sus metas por aproximadamente un año. La [q]uerellante primero indicó no recordar casos específicos de cómo las metas se vieron afectadas por enfermedad de un empleado, pero luego identificó a la Sra. Ana Flores quien era una representante de garantías, cuya ausencia del trabajo la afectó en el cumplimiento de sus metas. No obstante, falló en establecer qué mes dicha empleada estuvo fuera.

Finalmente, en cuanto a la falta de personal, la [q]uerellante identificó al técnico automotriz, Carlos Mateo, quien trabajaba en el taller de servicio de Volkswagen. Sin embargo, la [q]uerellante testificó que

[e]ste se marchó de empresa justo antes de su licencia médica, la cual sucedió en agosto de 2021, inmediatamente antes de la reunión del 6 de septiembre de 2021. Por consiguiente, dicha ausencia no tuvo efecto alguno en los meses anteriores, en que la prueba estipulada demostró que la [q]uerellante no cumplió con las metas

Por otro lado, Bella presentó prueba testifical donde explicó c[ó]mo establecían las metas a base del historial de desempeño del taller de servicio y de la industria. El Sr. Medina declaró, y así había sido reconocido por la [q]uerellante durante su testimonio, que el cumplimiento con las metas era esencial para la rentabilidad de la empresa y cómo no cumplir con estas ponía en riego a la existencia de la empresa. El Sr. Medina explicó en su testimonio que el criterio de evaluación más importante eran las horas de servicio. Al analizar las evaluaciones para el año 2021, la [q]uerellante cumplió con dicha meta en s[o]lo 2 ocasiones e incumplió en 15 ocasiones. De hecho, en el 2021 todas las evaluaciones de la [q]uerellante reflejaron un 57% o menos, excepto por una de 71% en marzo, lo que quiere decir que la [q]uerellante incumplió en todas las evaluaciones del 2021 y la gran mayor[í]a eran deficientes.

El Sr. Medina declaró que la [q]uerellante incumplía con el requisito de la utilización de la herramienta TruVideo, la cual era la herramienta más eficiente para incrementar las horas de servicio de un taller y asegurar la lealtad del cliente, todo lo cual contribuía a que pudiera cumplir con las metas impuestas. Las evaluaciones demuestran como la [q]uerellante incumplía crasamente con tal requisito. En septiembre y octubre del 2020, en los talleres de Honda de Bayamón y Mazda Bayamón, no se hizo TruVideo alguno. Y eso es a pesar de que en el mes de septiembre del 2020 el taller de servicio de Honda debió haber enviado 345 TruVideos y el de Mazda debió haber enviado 73. Flagship Volkswagen hizo 6 cuando tenía que haber hecho 182 en el mismo periodo.

Para el mes de octubre de 2020 los talleres de servicio de Honda y Mazda debían haber enviado 353 y 59 TruVideo respectivamente, pero no enviaron ninguno. En Flagship Volkswagen se enviaron 18 cuando tenía que haber hecho 184. Aunque en noviembre se aumentó el envío de TruVideo, y en diciembre de 2020, enero y febrero de 2021, se cumplió con dichos envíos, la tendencia revirtió al mismo patrón previo de incumplimiento. A partir del mes de marzo de 2021, no cumplió en mes alguno con el envío de TruVideo, excepto en Honda de Bayamón y solamente en el mes de abril.

Finalmente, la alegación de la [q]uerellante de que no cumplía con las metas debido a que Bella no la ayudaba en sus labores, no solo [e]sta no pudo demostrar tal hecho, sino que la prueba testifical y documental demostró lo contrario.

Durante el juicio quedó establecido que la empresa había asignado un gerente adicional para apoyarla en sus funciones, y la misma [q]uerellante identificó a Alexandra Rosario y a otra de nombre Chrisnette, como empleadas que la empresa asignaba para asistirla en su trabajo. Además, la prueba demostró como el Sr. Medina, sostenía reuniones diarias con la [q]uerellante y creaban un plan de metas diarias las cuales ella, como [g]erente de [s]ervicio[s], se comprometía a cumplir.

La [q]uerellante de ninguna forma logró probar que estas metas fueran arbitrarias o caprichosas. Por el contrario, la prueba demostró que la acción tomada por Bella era una legítima para salvaguardar la salud del negocio, esto debido al sostenido incumplimiento de la [q]uerellante con las metas.

Ahora bien, e independientemente de todo lo anterior, no podemos pasar por alto, el hecho de que la [q]uerellante desde 22 abril del 2021, en reunión sostenida con la Sra. Rodríguez la [q]uerellante expresó que necesitaba un cambio y que no se vislumbraba como [g]erente de [s]ervicio[s]. Esta conversación surge de un correo electrónico de esa misma fecha, el cual forma parte del expediente de personal estipulado en su totalidad por las partes y admitido como Exhibit 1 de la parte [q]uerellante. En ningún momento la [q]uerellante declaró con relación al mismo, por lo que no controvirtió lo expresado en dicho documento. Por otro lado, la Sra. Rodríguez, declaró sobre la reunión y la solicitud de la [q]uerellante a los efectos de no querer continuar en la posición de [g]erente de [s]ervicio[s] y un cambio de posición. Así como las veces que posterior a dicha fecha se reunió con ella para asistirla y en dichas reuniones la [q]uerellante reiteraba su solicitud de cambio. El Sr. Medina también declaró que como su oficina era contigua con la de la [q]uerellante ambos hablaban frecuentemente, y aparte de notar una actitud no esperada de ella, buscaba la forma de asistirla para mejorar su desempeño. La prueba demostró que es en este contexto que la [q]uerellada, al remover a la [q]uerellante de su posición, le ofreció la alternativa de ocupar otra posición, la cual, aunque de menor jerarquía, le brindaba la oportunidad de continuar trabajando y recibir una potencial compensación comparable o mayor que la que recibía como [g]erente de [s]ervicio[s].

De todo lo anterior, surge que el acto de remover a la [q]uerellante de su puesto como [g]erente de [s]ervicio[s], no estuvo motivada por una razón ajena al legítimo interés de salvaguardar el efectivo desempeño de la empresa, sino todo lo contrario. (Énfasis nuestro).

Este Tribunal revisor debe comenzar aclarando cuál era la controversia que el foro primario tenía ante sí. Surge del expediente, específicamente de la *Minuta* que recoge lo ocurrido en la

Conferencia con Antelación al Juicio celebrada el 14 de febrero de 2024,[5] que existía una confusión de las teorías del caso de las partes.

Surge de dicha *Minuta*, que la parte apelante solicitó que la apelada aclarara su teoría del caso, pues Bella sostenía que el cambio de puesto de Guevara Núñez surgió por dos razones: (1) Guevara Núñez solicitó el cambio de puesto; y (2) el desempeño de Guevara Núñez en su puesto como gerente de servicios no era el esperado por la compañía. Luego de escuchar los planteamientos de las partes, el foro primario acogió ambas razones como la teoría de la parte apelada. Se desprende, tanto de la transcripción de la prueba oral (TPO) como de la *Sentencia* apelada, que el foro primario tomó ambas razones como ciertas y justificadas.

Al evaluar sosegadamente la totalidad del expediente, la prueba documental y la TPO, no cabe duda de que la controversia no gira a si ambas razones fueron justificación para el cambio de puesto de Guevara Núñez. Como indicamos anteriormente, no hay controversia de que Bella removió a Guevara Núñez de su puesto como gerente de servicios y le ofreció un puesto de menor jerarquía como asesora de servicios, lo cual representa una destitución a un puesto no solicitado por la apelante.

De la página 358 del Exhibit #1 (Expediente de Personal) estipulado por las partes y desfilado en el juicio en su fondo, surge que el 22 de abril de 2021, Daisy Rodríguez le envió un correo electrónico a José Medina, en el que informaba que Guevara Núñez había expresado su interés en continuar en la empresa, pero que presuntamente le gustaría ser parte del área de adiestramiento de servicio o mercadeo, por estos ser puestos más dinámicos y con más

---

[5] Apéndice del recurso, págs. 533-542.

interacción interpersonal.[6] Sin embargo, no obra en autos, ni en la TPO, evidencia alguna que arroje que dicho petitorio fue tomado en consideración en ese momento en el que alegadamente fue expresado por la apelante. Por el contrario, pasaron meses sin que Bella le hiciera acercamiento alguno a la apelante sobre la posibilidad de ocupar dichos puestos. Lo ocurrido en septiembre, y lo que da génesis al presente pleito, fue la decisión de la parte apelada de destituir de un puesto gerencial a Guevara Núñez porque, según alega, no se había desempeñado de forma satisfactoria para la empresa. En ese sentido, no podemos contemplar la solicitud de cambio de Guevara Núñez porque de la prueba que obra en autos y según lo que surge de la TPO: (1) la solicitud de cambio surgió en abril de 2021; (2) dicha solicitud fue específicamente a dos áreas particulares, la de adiestramiento y la de mercadeo; (3) la destitución del puesto de gerente fue meses después a un puesto que no fue el solicitado, independientemente si los puestos solicitados eran o no de la misma o menor jerarquía que el que le ofrecieron.

Es decir, aquí no estamos ante el supuesto de que la apelante solicitó un cambio, se lo concedieron, pero no fue a un área de su agrado, según lo planteó la parte apelada. Sino que los hechos incontrovertidos del caso establecen claramente que Guevara Núñez fue destituida porque incumplió con las metas establecidas por la empresa durante los años 2020 y 2021. Por lo tanto, **la controversia que permeaba este pleito era determinar si las metas incumplidas por la apelante**, de lo cual no surge duda, **dependían directamente de su desempeño y si estas eran alcanzables durante el término que las incumplió. Asimismo, había que**

---

[6] Entrada Núm. 89 del Caso Núm. BY2022CV04994 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC).

**analizar si el incumplimiento de esta ameritaba una destitución de gerente a asesora de servicios.**

De la TPO y de la prueba documental, surge que las metas establecidas por la compañía giran en torno a la producción de cada localidad, la cual se divide en servicios y ventas. Entre los renglones a evaluar, hay metas dirigidas a la venta de gomas y productos *Air Life*, así como a las horas de servicio y el por ciento de *Customer Pay,* entre otras consideraciones. Estas "metas" no dependen principalmente del desempeño de la apelante como gerente de servicios y su cumplimiento con las normas establecidas en el *Manual del Empleado* de Bella.[7] La prueba demuestra que el cumplimiento de estas metas está directamente relacionado con el trabajo y el desempeño del personal encargado de brindar el servicio a los vehículos y de vender los productos, lo cual no recae sobre las responsabilidades de un gerente de servicios, según se desprende de la prueba documental y testifical. Además, el cumplimiento de dichas metas depende sustancialmente en la clientela que visite y solicite los servicios de cada localidad, lo cual representa un factor variable del que la apelante no tiene control.

Al examinar la determinación apelada, colegimos que procedía realizar un análisis sobre las responsabilidades que tenía una gerente de servicios, versus las metas a cumplirse y si estas estaban relacionadas directamente con su desempeño. En consecuencia, nos dimos a la tarea de reproducir a continuación la descripción de los deberes de una gerente de servicios de Bella, según surge del Expediente de Personal estipulado por las partes:

> **Descripción General:**
> El Gerente de Piezas y Servicios se asegura de mantener el más alto estándar de servicio al cliente maximizando las ganancias del Centro de Servicio mediante la administración efectiva y logro de las metas de producción establecidas por la Empresa.

---

[7] Entrada Núm. 89 del Caso Núm. BY2022CV04994 en el SUMAC.

**Funciones del Puesto:**

- Aplicar y modelar los Valores Institucionales ("Lo que nos Guía") en el trabajo diario y todo el proceso de servicio.
- Ofrecer un servicio al cliente interno y externo extraordinario siguiendo los Estándares de Servicio, Normas y Políticas establecidas por la compañía.
- Asegurarse de conocer, practicar, respaldar y fomentar las mejores prácticas y procesos establecidos por la Empresa.
- Supervisar y evaluar el desempeño de todo el personal del Centro de Servicio consistentemente.
- Coordinar y establecerlos horarios de trabajo del personal del departamento, así como vacaciones, días libres, turnos y tareas. Trabajar la aprobación y revisión de la asistencia en el sistema designado para nómina.
- Adiestrar al personal de nueva contratación y ser un facilitador activo en el desarrollo constante de ramperos, asesores, técnicos y demás personal a cargo.
- Mantener un ambiente de trabajo según los parámetros de la empresa, referir candidatos externos y lograr la retención de su equipo de trabajo.
- Atender las necesidades del personal y dar seguimiento a los asuntos relacionados.
- Realizar reuniones semanales con todo el equipo y One-On-One's mensuales para comunicar noticias, resultados, expectativas, aclarar dudas e inquietudes.
- Atender a los clientes personalmente, atender sus necesidades de manera proactiva para que cada oportunidad redunde en ventas, satisfacción y lealtad del cliente.
- Preparar reportes según sean requeridos y definir acciones concretas basadas en el análisis de estos.
- Realizar trabajo administrativo: evaluaciones, nómina, órdenes de compra y cualquier otra tarea requerida.
- Atender y manejar todas las situaciones que surgen diariamente, tanto con clientes, como con empleados y otros departamentos de la Empresa de manera positiva y siempre buscando eficiencia en los procesos.
- Velar por los activos de la Empresa, supervisar que todo el personal cumpla con los procesos internos, supervisar la venta, manejo de inventario y transacciones, así como hacer autorías internas periódicamente.
- Participar y asegurarse de que el personal a su cargo cumpla con todos los Adiestramientos, Certificaciones, Módulos y Programa de Educación Continua ofrecidos por Bella Group, manufacturero o consultores externos.
- Conocer y asegurar que el personal utilice efectivamente las herramientas implementadas

por la empresa (Ej. TrueVideo, Sistemas Dealer Socket, Dealer Star, ADP, etc[.]).
- Cualquier otra tarea o función necesaria para el buen funcionamiento del Departamento y la Empresa.[8]

De lo anterior se desprende que la propia empresa ha sido contradictoria, pues indica como descripción general que la persona gerente de piezas y servicios debe asegurarse de mantener el más alto estándar de servicio al cliente maximizando las ganancias del centro de servicio mediante la administración efectiva y **logro de las metas de producción establecidas por la empresa**. Sin embargo, las funciones del puesto no van dirigidas a que sea la persona gerente quien logre esas metas, sino que dichas responsabilidades están encaminadas a la administración, supervisión y adiestramiento del personal. Ninguna de las metas establecidas por la empresa incide sobre dichas responsabilidades, pues estas son mayormente sobre el volumen de producción y ventas, lo cual depende de la cantidad de clientela que busque los servicios de la compañía en determinado tiempo, así como del servicio que les brinden otros empleados, ninguno de ellos la persona gerente del establecimiento comercial.

Lo anterior se ve reflejado consistentemente en la prueba documental y testifical que el foro primario tuvo ante sí. Por ejemplo, en las recomendaciones/observaciones/comentarios incluidos por la apelada en el *Informe de Producción: Evaluación del Gerente* de la localidad Honda de Bayamón para el periodo de octubre de 2020, le indicaron a Guevara Núñez que "[e]s importante que los asesores expliquen la inspección multipuntos a todos los clientes".[9] Este es un ejemplo claro de que las "metas" de la empresa no dependen directamente del trabajo o desempeño de la aquí apelante, pues su puesto es gerencial y no de asesora. Es decir, la apelante, como

---

[8] Apéndice del recurso, pág. 557.
[9] Entrada Núm. 89 del Caso Núm. BY2022CV04994 en el SUMAC.

gerente, puede adiestrar y supervisar al personal para que cumpla con dicha meta, pero tal cumplimiento depende finalmente de la persona empleada como asesora. Nada en dicho informe señala que a Guevara Núñez se le evaluó por su desempeño con la supervisión y adiestramiento de la asesora de servicios, cuya responsabilidad sí recae sobre la apelante. En ese sentido, no se puede penalizar a Guevara Núñez por el incumplimiento de otras empleadas.

De igual forma, otro ejemplo que evidentemente el foro de origen no tomó en consideración al momento de apreciar la prueba y llegar a una determinación, surge del *Informe de Producción: Evaluación del Gerente* de la localidad Mazda en Bayamón, para el periodo de octubre de 2020. Se desprende de dicho documento que la meta establecida para la venta de gomas era de doce (12), mientras que el resultado fue de cuarenta (40). Es decir, durante ese periodo, la venta de gomas fue aproximadamente tres veces mayor a lo proyectado como meta para ese mes. Sin embargo, entre las recomendaciones/observaciones/comentarios realizadas por el patrono, este indicó que, "[e]n comparación con sus resultados de septiembre, disminuyeron sus resultados en la venta de gomas [...]. El que disminuyan los resultados de su centro en todas las métricas es sumamente peligroso y debe atenderse de inmediato. Tiene los recursos y el apoyo para lograrlo".[10] (Énfasis omitido). No obstante, además de no especificar cuáles eran esos recursos y presunto apoyo con el que contaba Guevara Núñez, no validaron el hecho de que ese mes se cumplió con la venta de gomas, contrario al periodo anterior, aun cuando ello, reiteramos, no dependía de la labor desplegada por la apelante.

---

[10] Entrada Núm. 89 del Caso Núm. BY2022CV04994 en el SUMAC.

De igual forma, surge del *Resumen de Reuniones Sostenidas* con los gerentes de piezas y servicios de Bella durante el periodo de julio 2020 lo siguiente:

**Temas [d]iscutidos que requieren atención inmediata:**

[…]

**III.    Producción y Resultados**

- **Cada gerente recibió un adiestramiento One-On-One durante el mes de julio por parte de David Ayala para conocer y maximizar su P&L.**
- El objetivo y compromiso diario lo establece cada gerente con aprobación del VP de Servicio. Este debe responder al cumplimiento de la meta mensual y lograrse diariamente.
- **Venta de gomas, es requisito diario. Se facilitó adiestramiento para que asesores incrementen ventas de gomas**, se entregaron medidores de gomas a todos los centros y se trabajó para mejorar el inventario de gomas.
- Se envió documento Repaso de Servicio para lectura y firma de asesores y gerentes. Todos los gerentes deben discutir el contenido con los asesores en reunión de staff semanal.
- En el mes de julio se realizaron cambios en el Pay Plan de técnicos, quick lubes y master technicians para beneficio de cada empleado y de la empresa. El tema es "A subir el Nivel" y se enviaron Talking Points a los gerentes que deben incorporar en el mensaje semanal que comunican a sus equipos para reforzar continuamente el tema.
- Es requerido completar la Documentación de la Producción Mensual de asesores y técnicos (mayo, junio y julio). **Deben llenarlo y enviar a Recursos Humanos para expediente del personal antes del viernes[,] 21 de agosto de 2020**.
- Está establecido que ningún empleado de la empresa puede utilizar los materiales, equipos o recursos de la empresa, así como compra de productos para su beneficio personal sin autorización o incumplimiento con el debido proceso establecido.
- Se ha observado particularmente en el personal de Piezas y Servicio incumplimiento con el Código de [A]pariencia y Vestimenta Personal. Gerentes tienen que inspeccionar a

> sus empleados diariamente y velar por el cumplimiento de las normas.
>
> ○ Prestar especial atención a:
>   - Tatuajes NO pueden estar visibles, deben cubrirse con manga larga o tricotas. OJO: Empleados de Taller, Asesores y Empleados de Piezas.
>   - Caballeros TIENEN que afeitarse diariamente, aún con el uso de la mascarilla.
>
> […]. (Énfasis nuestro).[11]

Nuevamente, la empresa deja claro que una de las metas, como lo es la venta de gomas, depende directa y exclusivamente de los asesores de servicios. Sin embargo, la parte apelada lo utiliza como método de evaluación hacia las gerentes, convirtiendo a las metas en caprichosas e irrazonables.

Cabe destacar que, la parte apelada pretende utilizar el cumplimiento de las referidas metas como un método de evaluación para destituir o despedir a una gerente de servicios ante su alegado incumplimiento de estas, bajo el subterfugio de que es parte de sus responsabilidades y funciones que acarrea el puesto. No obstante, además de que ello no surge del precitado desglose de responsabilidades que debe desplegar una persona gerente de servicios en Bella, surge que el cumplimiento de las metas es simplemente un mecanismo para bonificación de las gerentes. Nos explicamos.

Del Expediente de Personal surge que, además del ingreso base que tiene una persona gerente de servicios de Bella, también pueden recibir una bonificación que dependerá exclusivamente del nivel de producción y ventas de la empresa. Es decir, tal bonificación depende de que se cumplan las metas que la empresa establece mensualmente en cada localidad que opera. En particular, el *Plan*

---

[11] Apéndice del recurso, págs. 606-607.

*de Incentivos por Ventas y Desempeño* efectivo desde el 1 de febrero de 2020, establece lo siguiente:

### Objetivo

El plan de incentivo (el "Plan") está diseñado para fomentar el incremento en ventas de servicios bajo unas métricas saludables de acuerdo con los objetivos de Bella Group ("la Empresa"). La compensación como gerente de servicio incluye un sueldo básico y un incentivo mensual por los resultados obtenidos.

### Beneficios

Como parte del plan de compensación, el gerente de servicio tendrá los siguientes beneficios:

– Plan Médico
– Plan Dental
– LTD – Seguro por Incapacidad a Largo Plazo
– Seguro de Vida
– Elegibilidad para participación en [el] plan de retiro 401K
– Celular (empleado paga sus llamadas personales)
– Company Car (incluyendo gasolina, mantenimiento y seguro)

### Compensación

**Salario Base**: $50,000

Las bonificaciones se pagarán el día 15 del próximo mes. La bonificación mensual variable se divide en las siguientes métricas de desempeño:

### I. Centro de Servicio Honda de Bayamón

El gerente de servicio estará recibiendo bonificaciones al cumplir con estos requisitos mínimos:

- 1,100 horas de labor vendidas en el mes según [el] reporte "Service Performance Closed RO"
- 1.50 horas por RO "Customer Pay"
- Effective Labor Rate "Customer Pay" de $85.00
- 60% de las horas vendidas en el mes deben ser "Customer Pay"

[…]

### II. Centro de Servicio Flagship Chrysler Bayamón

El gerente de servicio estará recibiendo bonificaciones al cumplir con estos requisitos mínimos:

- 1,600 horas de labor vendidas en el mes según reporte "Service Performance Closed RO"
- 1.60 horas por RO "Customer Pay"
- Effective Labor Rate "Customer Pay" de $87.00

▪ 55% de las horas vendidas en el mes deben ser "Customer Pay"

[…]

### III. Centro de Servicio Flagship Volkswagen

El gerente de servicio estará recibiendo bonificaciones al cumplir con estos requisitos mínimos:

▪ 450 horas de labor vendidas en el mes según reporte "Service Performance Closed RO"
▪ 1.20 horas por RO "Customer Pay"
▪ Effective Labor Rate "Customer Pay" de $90.00
▪ 45% de las horas vendidas en el mes deben ser "Customer Pay"

[…].[12]

Es decir, ante el incumplimiento de dichas metas, lo que procedía era que Bella no le otorgara la bonificación a Guevara Núñez, no que la destituyera de su puesto a uno de menor jerarquía. No cabe duda de que la parte apelada utilizó un mecanismo de bonificación como si fuera uno de evaluación para justificar sus actuaciones, según surge de la propia prueba testifical.

Por otro lado, el foro juzgador no tomó en consideración el contexto histórico de la pandemia por COVID-19 y lo que ello implicaba en términos de producción, personal, distribución de piezas, ventas, entre otros aspectos a considerar. Tampoco consideró las condiciones restrictivas que surgieron durante esa época como resultado de la pandemia, sobre lo cual obraba evidencia en el expediente y durante el juicio. Sobre ese particular, contrario a lo expresado por el foro primario, surge de la TPO que la apelante testificó detalladamente sobre cómo la pandemia afectó las metas. En apoyo a su contención, la apelante utilizó ejemplos concretos y detallados de hechos suscitados en el periodo en el que las metas se incumplieron. Sin embargo, el foro *a quo* estableció un peso de la prueba más oneroso para la apelante, por entender que

---

[12] Apéndice del recurso, págs. 549-555.

de tres (3) a cuatro (4) ejemplos detallados, creíbles y que no fueron controvertidos, eran insuficientes para establecer cómo la pandemia afectó el cumplimiento de las metas de la empresa. No debemos pasar por alto que la pandemia por COVID-19 tuvo efectos sustancialmente dañinos a la economía mundial, sobre lo cual el tribunal pudo tomar conocimiento judicial. Cabe destacar que el foro primario tampoco tomó en consideración que la destitución de la apelante surgió cuando esta regresó de una licencia por enfermedad, según surge del expediente que tuvo a su haber el foro juzgador.

De una evaluación concienzuda, exhaustiva, ponderada, objetiva e imparcial, colegimos que la apelante probó el segundo requisito para la configuración de despido constructivo, contrario a lo resuelto por el Tribunal de Primera Instancia.

Superado lo anterior, era menester del foro de origen resolver el tercer requisito para que se configure un despido constructivo. Dicho requisito requiere que se determine si se crearon unas condiciones onerosas por parte del patrono de manera tal que la persona empleada no tuviera otra alternativa que renunciar. Sobre ese particular, el foro primario indicó que, al entender que se incumplió con el segundo requisito, era innecesario entrar a dilucidar el tercero. Sin embargo, el tribunal de instancia expresó que, por las razones discutidas en su análisis del segundo requisito, la respuesta al tercero sería en la negativa. En específico, expresó que:

> El testimonio de la Sra. Rodríguez fue que[,] entre las razones para ofrecerle a la [q]uerellante la posición de [a]sesor de [s]ervicio[s][,] es por la posibilidad que tiene dicha posición de generar un ingreso similar o mayor al de [g]erente de [s]ervicio[s] que era el que ocupaba la [q]uerellante. Ahora bien, el no concederle a la [q]uerellante la posición de adiestramiento que solicitó tampoco era un acto que ante un criterio objetivo forzaría a una persona razonable a renunciar. Primero, dicha posición no estaba disponible para el periodo relevante. Segundo, dicha posición se asemejaba en ciertos rasgos a la posición de [a]sesor de [s]ervicio[s]. Conforme la Sra. Rodríguez explicó que la posición de

adiestramiento, al igual que la de asesor, no supervisa a otros empleados, por lo que ambas posiciones eran de menor jerarquía que la posición de [g]erente de [s]ervicio[s], quién sí supervisa empleados.

Reiteramos que no nos encontramos ante un supuesto donde hay que considerar si Guevara Núñez solicitó o no el cambio de puesto a uno de menor jerarquía, pues como explicamos anteriormente, ello presuntamente ocurrió en abril de 2021 y no tiene relación alguna con su destitución en septiembre del mismo año. Recordemos que la destitución, según aceptado por la parte apelada, se debió al incumplimiento de la apelante con unas supuestas metas de producción establecidas por la empresa, las cuales no dependía de la apelante cumplir. Por lo tanto, debemos evaluar si la destitución por el presunto incumplimiento con unas metas, que no dependían de su desempeño, creó unas condiciones onerosas por parte Bella de manera tal que Guevara Núñez no tuviera otra alternativa que renunciar.

Surge de la prueba documental, de la TPO y de los hechos estipulados por las partes que la destitución de Guevara Núñez fue a un puesto de menor jerarquía que el que tenía. Si bien la apelada plantea que le hizo un favor a la apelante al no despedirla y ofrecerle un puesto donde tendría oportunidad de superar sus ingresos como gerente de servicios mediante comisiones, de la prueba desfilada ante el foro primario se desprende que tal aseveración es especulativa. En particular, la parte apelada admitió que el salario base del puesto de asesora de servicios es menor al de gerente. Asimismo, de la prueba documental surge que el puesto de gerente de servicios tenía beneficios como un vehículo de la compañía, con gasolina, mantenimiento y seguro incluido, así como un celular. Además del salario base y los beneficios marginales, el puesto de gerente tenía una bonificación, según detallado, que brindaba la

posibilidad de obtener un mayor ingreso. Por el contrario, el puesto de asesora de servicios no tenía tales beneficios.

De otro lado, surge de la prueba documental y testifical que había otros puestos de menor jerarquía que el de gerente de servicios, pero mayores que el de asesora, en los cuales Guevara Núñez se había desempeñado anteriormente y no representaría una destitución tan significativa. Asimismo, es un hecho estipulado por las partes que Guevara Núñez renunció porque la movieron de la posición de gerente de servicios, pues si ello no hubiera ocurrido, no hubiera renunciado. De la prueba testimonial incluso surge que la apelante sugirió alternativas para que la trasladaran a otros centros de servicios de la compañía –como hicieron con otros gerentes– o que la pusieran en otros puestos gerenciales, los cuales fueron rechazados por la parte apelada.

No cabe duda de que Guevara Núñez fue removida del puesto de gerente de servicios por incumplir con las metas establecidas por la empresa. Ahora bien, según colegimos, estas eran onerosas porque no dependían directamente del desempeño de la apelante, según probado mediante prueba documental y testimonial. Sobre ese particular, surge de la TPO que Guevara Núñez le comunicó a su supervisor José Medina constantemente los problemas que estaba atravesando para cumplir con las referidas metas. Por ejemplo, los efectos que trajo consigo la pandemia del COVID-19, como el atrasado en el inventario de piezas para poder brindar los servicios, la ausencia de empleados o el alto *turnover* de estos. Se desprende de la TPO que, si bien se realizaban planes a corto plazo para intentar resolver los problemas, como utilizar empleados de otras áreas para cubrir las que no tenían empleados presentes ese día, no eran soluciones efectivas, ni incidían en mejorar el desempeño de la apelante como gerente de servicios. Por ejemplo, tales empleados no tenían la experiencia para ejecutar

eficientemente los puestos a los que eran llamados a cubrir y, aun cuando la apelante comunicaba esto a su superior, ya que la solución de los problemas no las podía ejecutar Guevara Núñez directamente, sino que era a través de su supervisor, este último, según surge de la TPO, no daba soluciones concretas. Por el contrario, le indicaba a su subordinada que buscara la manera de "hacerlo", aun con la falta de personal para poder brindar los servicios eficientemente y cumplir con las metas establecidas por la empresa. Tales actuaciones, así como los demás ejemplos aquí detallados, crearon unas condiciones onerosas por parte de Bella de manera tal que Guevara Núñez no tuvo otra alternativa que renunciar. Por consiguiente, la apelante probó el tercer y último requisito para establecer que hubo un despido constructivo e injustificado. En conclusión, los errores señalados se cometieron.

En mérito de lo anterior y según detallado, el Tribunal de Primera Instancia erró al desestimar con perjuicio la acción de epígrafe. Procedía declarar Ha Lugar la *Querella* incoada por Guevara Núñez y concederle el remedio solicitado. En consecuencia, revocamos la determinación apelada.

**IV**

Por las razones que anteceden, revocamos el dictamen apelado. Declaramos Ha Lugar la acción de epígrafe y, en su consecuencia, concedemos el remedio solicitado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones